8, 2, 3, and each side will have 10 minutes. Good morning, your honors. Katie Herlbrink on behalf of Ms. Madueno. This court should reverse the denial of two suppression motions in Ms. Madueno's case. First, Tobias holds that Ms. Madueno's exact words, can I have an attorney, are an unequivocal invocation. Thus, her subsequent statements should have been suppressed. Second, the government has waived any argument that the collective knowledge doctrine applies and Agent Contreras' own observations are insufficient to give rise to reasonable suspicion. Thus, the fruits of her stop should be suppressed too. So if you win, then what? You'll go back and she'll withdraw the plea? Is the sentence, though, almost completed? Um, that's correct, your honor. Ms. Madueno has been sent to a halfway house, but she would still have the opportunity to withdraw her plea and determine whether to go forward and challenge her sentence. Yes, your honor. We have two different issues and it would seem to me that if you did not prevail on the Fourth Amendment issue, even if you prevailed on the Fifth Amendment issue, I mean, that would be up to her to decide what to do, but it's not clear what that would actually get her in this case. Do you agree with that? Your honor, I believe that she would still have a better opportunity to prevail at trial. Of course, her statement was a pretty much a full confession to having smuggled drugs. We do in cases without a full confession, we do win these cases in district court quite frequently. And so I think it really could make a difference for her, but as your honor is saying, it would just be up to her to withdraw her plea and then make that decision. So starting with the statement's issue, Tobias versus Ortega holds that could I have an attorney is an unambiguous invocation under clearly established law. Tobias also notes that could and can mean the same thing. So it follows that Ms. Madueno's words, can I have an attorney, are an unambiguous invocation under clearly established law. It's true that she made some equivocal statements after invoking, but under Smith versus Illinois, it's clear that those statements can't be considered to cast doubt on her initial invocation. Counsel, if I buy all of that, and at least tentatively, I think I do, what about the practical question where she's really seems to me to be pretty clearly saying am I going to be able to get an attorney? She doesn't have an attorney, and she seems to be saying if I've got to wait six hours, I'd really rather talk. Is she not permitted to do that once she makes the initial request? And as I say, at least tentatively, I'd buy that. So what's the ability to solve that practical problem? Sure. So I think Your Honor is referring to statements she made after she invoked, and critically, after the agent continued questioning her. So Ms. Madueno invokes, the agent here responds and tries to follow up and says, oh, so you want an attorney? So he asks her an additional question, and only then do they start to engage in this back and forth about, well, when would the attorney come? Will we have him now? Do I get a phone call? Smith holds that when all of those sort of questions or concerns that are raised come in response to police questioning, as they did here, as they do in Smith, then none of those things can be considered. Now, if Ms. Madueno had herself invoked, and then the agents had done exactly what they were supposed to do, stopped questioning her, and then later on she reinitiated, there's a whole different line of case law that applies to that situation. So by saying, if she had said, how soon can I get an attorney? And they say, you know, don't know, might be. Then maybe she says, at that point, would it be okay for her to go ahead and keep talking? If she had simply said, how soon can I get an attorney? I think that would pretty clearly be an equivocal invocation at best. So then the- As the initial statement, though. Because I think you're saying, once she says, could I get an attorney? It's done no matter what she says next. You're saying if she had said that as the first thing? Precisely. Precisely, Judge Friedland. If that's what she said, instead of saying, can I have an attorney? That would be equivocal. Then the Smith rule would not kick in. So you just, when she said, can I have an attorney? Can I have an attorney? Your position is they should have just said, yes, we'll get that for you. Full stop. And then if she reinitiated, then it's a different situation. Correct. Correct, Your Honor. And- What if she had said, could I get an attorney? How long would it take to get an attorney? I think in that situation, we would be looking at the statement potentially as a whole. That second statement would not come in response to police questioning. So we'd be in a different situation. The Smith rule would not apply the same way. Let me go ahead and take you to the other point, if you're ready for that. Yes, Your Honor. Which is, your position with regard to the Smith information, we'll call that the BOLO as opposed to the alert. Is it that Agent Contreras should have simply disregarded it and gone on to lunch? Or was it okay to at least read it and notice the car? So, Your Honor, I'd like to distinguish between two different things. Agent Contreras was, of course, perfectly free to consider subjectively whatever he wanted to consider, including the alert. And it's not surprising that he did consider this alert from his colleague. The question Your Honors have to answer is whether there objectively was reasonable suspicion for this stop. Now, I understand that, but I wanted to get over that first point so that from your point of view, it was permissible to notice the car. And at that point, I take it your issue is, if you don't give some weight on the scales to the BOLO, you think the rest of it, what Contreras found himself, the driving, and all of that doesn't rise to the level of reasonable suspicion. Precisely. The government, I guess their position would be, well, they'd like to consider the BOLO. But even if you don't, you know, the thresholds here, we're already up here. You go to Arvizu, you know, Arvizu takes a whole bunch of individual things, adds them up and says, this is a totality of the circumstances. So as a conceptual matter, are we kind of on the same page? It's just you think they don't add up this high, the government's going to tell us that it does. Even if you ignore the substance of the BOLO. Is that all fair? I think that's all fair. And I would just add for clarification, we don't think that the BOLO can be considered for the objective, reasonable suspicion analysis in whole or in part. So the BOLO is just a non-entity as far as reasonable suspicion. Even though Smith is an analyst in this area, they know who he is, he's not anonymous. They're not saying, I think, that it's enough alone to make the stop. But why isn't it worth something? Because Thomas holds that these kinds of conclusory law enforcement statements cannot be considered in whole or in part. And your honor points out that here, Agent Contreras knew who Agent Smith was. That's exactly what happened in Thomas. The agents who effectuated the stop in Thomas knew that they were receiving information from the FBI. So this, nevertheless, this court held that those law enforcement tips, these conclusory law enforcement tips, must be subjected to the same standards as civilian. When it says the information must be based on reasonable suspicion, that's kind of an odd phrase because usually reasonable suspicion is a standard. The basis is usually indicia of reliability, for example, where an anonymous tip has less indicia than an analysis by a known analyst, right? That's correct, your honor. But what Thomas ultimately actually held was, and this is at the final paragraph, they cite Florida versus JL, which is a case about civilian tips. And then they say the FBI information here lacked any indicia of reliability and was too vague and generalized to play any part. Because there they're just saying we heard from somebody something that might be something that might be something. That's a bit less indicia of reliability than here, isn't there? That is, Smith is a known person. It's his job. You know, he might be right, might be wrong, but it has some indicia of reliability, doesn't it? Your honor, I disagree because it's not that in Thomas they heard from some unknown person. They heard from the FBI and they told the court, we heard this from FBI agents. But what the FBI agent heard was pretty vague. Well, we don't know what the FBI agent ultimately heard and neither did the person who received the tip. Likewise here, Agent Contreras did not, when he received this email from Agent Smith, know what Agent Smith's basis was. In fact, Agent Smith did not even accuse Ms. Madueno of a crime in this email. I think part of this is just the context of what we're talking about, which is the border. So, I mean, there's an understanding that when there's a photograph of a car that's been through the border and this has been circulated automatically based on Smith's, we'll worry about the time later, hopefully, based on Smith's review and analysis, that that does mean something in the context of the border, in the context of the agents who are patrolling the border. Now, it doesn't necessarily mean he could have pulled her over right then as soon as he saw the car. That would be a totally different case. But it's something. Even so, though, I don't know how much this really matters to the overall analysis when he then goes and does the computer check and sees the same history of crossing the border that led Smith to put the bolo in place in the first place. So why would that not matter quite a bit in the analysis? So, Your Honor, I see I'm over time, but if it's OK, I'll go ahead and answer your question. So I think your question has a couple of parts. So first, Your Honor said that these bolos, you can sort of assume that they mean that this person, that Agent Smith has reasonable suspicion. I'm not assuming them. I'm just I'm looking at the testimony of Contreras and what he had to say about what the bolo meant to him as an agent who works at the border. Right, Your Honor. And so he said it was the assumed possibility of the vehicles being involved in smuggling. The vehicle might be involved in smuggling. The vehicle could be involved in smuggling. Even Agent Smith himself said that he only usually places these alerts when he sees these unusual driving patterns. So that's the answer to Your Honor's, to the first part of Your Honor's question, is that these statements are just as conclusory as they were in Thomas in that way, and that it's simply a possibility of smuggling. So I'm a little confused by your answer there because I thought your position was that they all knew that Contreras needed to develop his own assessment of the car. So I thought that testimony really suggested that they didn't put really any weight on the bolo, but you just gave an answer that suggested that maybe there was more. Your Honor, I agree with Your Honor that Agent Contreras knew he had to develop his own independent reasonable suspicion. That's well supported by the record. But separately, the prosecutor asked Agent Contreras, well, what do you understand about these alerts when you receive them? And Agent Contreras said, well, there's the assumed possibility of smuggling. There could be smuggling. There might be smuggling. And again, Agent Smith said that he only usually puts these alerts when he sees these sorts of suspicious driving patterns. And so just briefly, I'd like to answer the second part of Your Honor's question, which is about whether Agent Contreras and Agent Smith looked at the same information. They did not. The record does not support that they looked at the same information. Agent Smith looked at a full panoply of records. That includes internal checkpoint records from Highway 86. It includes Ms. Madueno's sentry application. It includes her full crossing history dating back six months. Based on Agent Contreras' testimony, the only thing he testified to looking at was this high-risk alert from the port of entry and some individual crossings by Ms. Madueno. He said he looked up her crossing history, but in terms of what he actually saw in that brief stop on the side of the road, he says he saw her crossing earlier that morning. He talks about seeing three other crossings in October and November. He says nothing about seeing the sentry application, the internal checkpoints, and that really matters because that was the basis. Well, okay. I mean, he did see... It's not as though he just saw the bolo and then followed her. He did go pause and see some information about her crossing history, including within some recent amount of time. Correct. He saw that she was a frequent border crosser who had crossed the border that morning. But then the question becomes, is that enough for particularized suspicion? And it's not because it doesn't sufficiently distinguish Ms. Madueno from the mass of law-abiding traffic that also crosses the border. But then we get into some of the other driving, you know, the moving in and out of lanes, not signaling, the bouncing. Then we get into a discussion about all of that. Yes, Your Honor. But just the crossing patterns alone, neither was Agent Contreras reaching Agent Smith's conclusions about suspiciousness, nor was he looking at the same information. Could I ask you a different hypothetical? So say that the email from Smith had been generated by a process that this department used. So say these emails only got generated when a car crossed 30 times in the week or something. And so you know when you get it, that means that some system generated, you know, notice this license plate 30 times. Could that be considered? Absolutely, Your Honor. Because in that situation, that is not a conclusory alert. Agents know based on their training and experience that this alert triggers when someone crosses 30 times. Therefore, they can take into account in their calculus, this car has crossed 30 times. The problem here is that they had nothing to take into account because Agent Smith did not provide any information about the basis for his suspicions. So it's raw data versus analysis by the analyst. So you're saying raw data would be OK, but the analyst isn't? Not quite, Your Honor. If Agent Smith had actually provided his analysis in that email, if he had said, you know, I've determined that Ms. Madueno made too few long trips to match up with her sentry application, or I've determined that her crossing patterns over the border and then back through the Highway 86 checkpoint. And the unmanned stations? If he had put all of that analysis into his alert, then absolutely, Agent Contreras could consider it. The problem here is that that email contained no information, not even a bare allegation of a crime. I don't, I mean, we've come up with some things that sound like they would create more reasonable suspicion, but I don't know that that demonstrates that what we have here would create zero. So, Your Honor, I would say that the reason why all of this doesn't add up, so I'm sorry, are you asking about like the totality of the circumstances or about the alerts specifically? Well, we can talk about the alerts, limited to the alerts if you want, but I think, you know, we could imagine a BOLO that has a lot of detail on it, all kinds of information. So we don't have that here, but there's a lot of people crossing the border, lots of cars, and so that may not be that feasible. But what we have here is something, and all we're thinking about is, is that something worth anything? And it seems to me it's worth more than zero. Well, Your Honor, in fact, in Thomas, when it comes to these conclusory alerts, they said it is worth zero. I mean, Thomas holds that it was that, you know, this FBI conclusory alert was too vague and generalized to play any part in the reasonable suspicion calculus. And elsewhere, they say that the agent's individual observations could be used, but that suspicions could not rely in whole or in part on the FBI tip. And so Thomas really does stand for the proposition that a conclusory law enforcement alert without indicia of reliability is a zero. Thank you. I'll still give you two minutes for rebuttal. So let's hear from the government. Thank you. Good morning, Your Honors. May it please the Court, Mark Grady for the United States. To pick up on the Fourth Amendment issue, the government has a few points to make. First of all, we would cite United States versus Hensley and push back against the idea that, you know, an alert that's devoid of any information or that's conclusory cannot be considered. In United States versus Hensley, the Supreme Court reversed the Sixth Circuit on that exact basis because the Sixth Circuit said, well, you had a wanted flyer there and you didn't put the details in. And the Supreme Court said, you know, that's not the question. And in fact, all that matters is that the alert itself could be explained, or in that case, the flyer, by reasonable suspicion. What about Thomas? Sorry, can I just ask you about Hensley first, though? Wasn't that flyer, I may be remembering wrong, but wasn't that essentially like an instruction to arrest the person, though? Because it had the details on the flyer of the robbery that he's accused of and all this. I thought that was more equivalent to a direction where, you know, a direction to arrest where then the knowledge is based on the person who gives the direction. Well, and I understand that's and that's how the defense is characterizing Hensley. But when I reread Hensley the other day, it's interesting. In the, you know, in the statement of facts, what it said that the, I think it was a police department, they asked anybody who came across this defendant to hold him. That was their direction. And at the end of them. But isn't that even a directing that to citizens? I mean, I would assume that means if you're a police officer and you see that, and I mean, the flyer, they talk about all the details that are in it about why this person's wanted. Isn't that a direction to an officer to hold or I mean, maybe hold is the same as arrest anyway. I don't know. Well, the only reason I brought that up is because of page 235 of Hensley. The Supreme Court said, look, what was asked in that case to just hold him until they showed up. We're not allowing that or we're not approving that. That might violate the fourth amendment. But what they said is, if you get in a flyer and if it's supported by reasonable suspicion, you can at least perform the limited detention that happened in that case. But even. So sorry, maybe I shouldn't have said arrest, but we're only talking about Terry stops here anyway, I think. But still, what you just said is the flyer was a direction to hold the person. And that means that we look at the reasonable suspicion of the person who made the flyer and whether it had good basis and whether it was enough for reasonable suspicion. So I think that's really different. Like no one is saying right now that the analysis is of Smith. Right, no, but I brought it up only because of this idea that, you know, if the alert itself, I mean, the question we're talking about here, and I think Judge Bress put it well, is like, it's more than just nothing. You know, he testified based on his training experience, which is always critical in this context. He knew exactly who Agent Smith was and that his job was. Smith could have directed Contreras to stop this person, but Smith did not. So it's not the same as Hensley. And we're not looking at, I mean, I don't think, I mean, can you tell me any information, any specific factor that goes to reasonable suspicion that Smith communicated to Contreras in this email? Only based on his training experience that he knows that, you know, no, it's not, because there are no words. You know, the email itself is just a picture of the car. So like what information does Contreras get? Can you just say what we're supposed to say is the piece of reasonable suspicion that comes from this email? Well, that instead of just out of the blue pulling over a random person, which is what the whole Fourth Amendment is directed against preventing, he knows from his 25 years on the job that this kind of a tip means that, you know, you go look, if you see this car, develop your own suspicion. And he knows that it's from somebody whose only job is on an intelligence team to do the analytics. But I agree, even Judge Huey, the district court below, this isn't an all or nothing thing. The case doesn't fall on, you know, all he said is like, I don't give it, it's not the sole factor. I just give it some weight. But, you know, another point that was brought up, if we just look to the actions, you know, I know that defense counsel had said that they didn't look at the same information. Again, we would disagree with that. The fact of the century application, sure, that might've been one extra detail. But if you look at excerpts of record, I believe it's pages 94 to 97, the defense, when cross-examining, pulled out exhibit B, which is an excerpt of record 164, and went over it for three pages. So, I mean, it seems like you're now backing away from the BOLO. So, I mean, I know you have an argument that the information they had was enough for reasonable suspicion, and we could discuss that. But I'm trying to figure out, if we doubt that, what piece of information comes from the BOLO that gets added to that, that tips it over the edge? Well, just it's mere existence. And the fact that he knows that, you know, it's like there was also a CBP alert for high risk of narcotics. It just goes to his objective indicia. My point is, I'm not defending the BOLO. It doesn't stand on its own. I just wanted to say, it could at least be reasonably considered here, because if there had been no testimony about where it came from, or who Agent Smith was, or whether Agent Contreras knew who he was, then I would agree. You know, I wouldn't have been- As a practical matter, it did arouse his suspicions. I mean, when he saw it, he was suspicious, naturally, because this is how it works down there, where we're going to send these emails out to people, and that's going to tell agents, this is a car that the analyst team is looking at. And so as a practical matter, it aroused his suspicion. He then followed up on that. He did, you know, and when, and you know, sometimes I think at one point, they made it sound like he was doing this while he was driving. He literally pulled over on the shoulder, and he ran, you know, and I know that the defense counsel said, well, he wouldn't have known about the checkpoint crossings. That's not true. Now we're going back to just everything he learned other than the BOLO, right? But just sticking on the BOLO for a second. So I mean, in my hypothetical to your opposing counsel, I think if there was a specific thing, like the BOLO is only triggered when X number of crossings happen, then you know there's this piece of information. Maybe what you're trying to suggest is there's like a few different things. He knows it's either too many crossings or something else or something else, and he's supposed to take some. I mean, what is it that you're saying he learns, even though it's an experienced person who sent it, what is he supposed to think it means? Well, you know, and again, it may not be a ton. It's just something. But saying that it's something, what is the something? That an analyst in my agency whose job it is, is targeting this car, is possibly suspicious of indicative of smuggling. But does that mean? And that doesn't mean that it is smuggling. Are you saying he knows something about the options that could have been that triggered that? I mean, maybe. I mean, are we supposed to know for sure that Smith didn't just have a quota and he had to do 100 a day or something? I mean, we have no idea, right? But that's, you know, this is again, this is just by reasonable suspicion. The question is, we look at the objective, you know, if a police officer pulls somebody over and sees there's a warrant from somewhere in Alaska, he's not necessarily going to know whether that's actually been, you know, a valid warrant or not. But the fact is, it shows to his objective state. That gets back to Hensley. A warrant would be, there's someone thinks you can arrest this person is almost directing you to do that. That's what a warrant is, right? We don't have that here. If we did, we could look at Smith's knowledge and we'd have a different inquiry. But I don't think that's what you're arguing here. No, look, I mean, the bolo, I mean, it is bare bones. I'm not denying that. I'm not going to lose credibility by coming up here and suggesting otherwise. All I'm saying is, as the district court concluded, it's not conclusive, but it's one piece, you know, it gets the ball rolling. I mean, you know, it's somebody, it's not just random. It's not anonymous. It's somebody whose job it was to come up with this information and ensure it all goes to the weight. The fact that it didn't say all the options that you were talking about or spell the things out. It was just a picture. But, you know, he said, we are trained and we have experience on this. Then when we get these things to look out for it. So we better ask you about the fifth amendment issue. Because I think the other side makes a fair point on that, at least under our case law. So how do you respond there? Well, the government's position, I mean, look, if you just pull out these phrases, sure, you know, the defense sites, three or four cases where that phrase was held, but it's never been that it's talismanic or it's, you know, strictly by the words here, Tobias, that's the case that the defense has relied on most heavily. That was a case where the defendant had already waived Miranda and well into the interview was shown an incriminating video. And that suspect said, could I have an attorney? Because that's not me. So that's what we're talking about here. We cite the case. I believe Ramirez, we haven't even gotten to a waiver yet. And this court has made clear that if there's any ambiguity during the advisal, that officer has a duty to clarify. And so here, when they ask one, you know, she answers a question with the question. She prefaces it with the pause. The question is, is what would a reasonable officer think in the circumstances? And I believe as Judge Boggs pointed out, you know, an officer could have thought, well, maybe she's saying I want one now. Maybe she's just trying to clarify whether she could have one. And I know that in the reply brief that the defense had said, oh, she had already twice indicated she understood her rights. All that's referring to is that she put her initials on the form when asked to do so. We would never defend a Miranda, you know, invocation based or a waiver based solely on that. She, you know, this had only taken place over a 30-second period. And so. I mean, on the face of the transcript, it seems a little equivocal. When you watch the video, though, it doesn't seem all that equivocal. I mean, she seems shy and afraid, given the situation. But she did clearly say, can I have an attorney? But as a form of question, too, you know? And so it's like if somebody asked fairly, though, you know, it was, I mean, if you listen to the video, it doesn't have quite the intonation that you can imagine that that phrase being used in different ways. And it seemed a little more definitive than the average question. I guess I'll put it that way. I agree. But then, you know, again, if the question is objectively, what would a reasonable officer say? You know, I think what's interesting when you look at this, they don't go ahead and launch into what were you doing? Why were drugs found in your car? They said, hey, it's part of your rights. Is that what you want? Because you can have one. No, I think that's a frustration by some in this area of law, that the officer's response to her question seems a fairly natural one. At the same time, I'm not sure it was, you know, we have other cases like that. And we've said that's not OK. I know, you know, and I, the government, we did our best. Like, you know, another one was Alvarez versus Gomez, where that person asked three times in a row. And the court made clear that it was because it was thrice repeated. You know, here again, if it's a totality of the circumstance. Well, she actually asked several times, too. She brought up the attorney more than once. Well, but we're talking about at the ninth minute. That was the first time she said it. Oh, yeah. And then when they're performing their duty to clarify, oh, yeah. And then it comes out, well, I want one, but I don't want to have to wait for one. Am I going to get one? You know, everything they said, it had nothing to do with the evidence against her. They were just trying to explain what the rights were. And so, you know, I think. Is there any relevance to the fact I saw that her father's apparently an attorney? I missed that. I don't even know that. Yeah, I don't know if that's accurate or not, but that's what it said. No, you know, I guess to the extent that would go to her, you know, the district court says she was of sound intellect. She was also, you know, high school graduate and in school for to be a teacher at the time. So she definitely, you know, had the intellect. And so I think that was what the judge pointed that out. But I didn't know about the part about her father being an attorney. So that's what was mentioned in the pre-sentence report. So could I ask back to the reasonable suspicion? How many times do you think she changed lanes without signaling? It doesn't specify. Maybe, you know, I think more than once. More than once. But I couldn't tell that it was more than twice, really. There's not really anything that tells us it's more than twice, right? Right. And I think the last thing, if I may, before I go, I did want to make clear on that reasonable suspicion point. I believe a defense counsel said when Agent Contreras pulled over, that he was whether he was looking at the same border crossing history. Again, this is an excerpt of record 164. It has not only the Wednesday incomings from Mexico over the port of entry, it also has the Border Patrol Campo crossings. And in fact, an excerpt of record, I believe it was 86. He specifically says, I saw she was going through the checkpoint. So with that, the government would submit. Could I, well, could I, I have another question. Sorry, let's try this again. We might still have questions. I would say, unless you have further questions. Do you have another? I'm sorry, just when you said you went through the checkpoint, did that mean that it was the non-operational checkpoint? I believe so, yes. Because, and on there too, there's a line for declaration. It says none was taken, which would indicate. Okay. On that, I thought that it hadn't been non-operational continuously. I'm sorry, can you point, does it say that for all of her crossings through the one that you're saying is non-operational, that it was non-operational at the time? Well, there's an N under a column that says declaration. But, you know, there was testimonies to the general, I think in Excerpture Record 62, there was testimony below that it's almost always operational. So it's very rare that it's not. But it hadn't in recent times not been operational? Is that? That's what they said at the time. You know, that wasn't any further specification beyond that. That was when the testimony happened in April 2023. The underlying events here, of course, I believe were in November of 2022. So we don't really know whether her crossings through it were when it was operational or not. Oh, no. Well, we know that from Agent Smith, but I'm saying that Excerpture Record 164. Right, but we don't think Contreras necessarily had that information that it was non-operational when she crossed. Well, I believe it can be inferred from that because there's that column that says declaration, yes or no. But he knew that she had wrapped in the Excerpture Record 164. But even if not, the government stands by the testimony. And again, you know, at Excerpture Record 94 through 97, Defense Counsel, for several pages, went over the same document with Agent Contreras. And at no point did he say, you know, I've never seen this before. This is news to me. He answered all the questions that she asked about it. Could I ask, I think at least in the reply brief, the argument is made that Contreras never explained why the lane changes were suspicious or even really why this pattern of boarding crossings was suspicious. Do you have a response to that? Only that it can be inferred from the record. And if that's what Agent Smith, he's an officer of 25 years, that he would know that that also. Well, he didn't know about the lane changes. So do you have a response to the idea that the lane changes, what makes the lane changes suspicious of smuggling? Well, only that it's erratic driving, you know, and that if somebody, I mean, when they signal to exit and then don't, that could be, you know, they're looking to see if the person behind them is going to exit as well. Again, it may not be the most suspicious thing. And that's what the district court said. It said individually, I don't find this particularly, but that it added to the totality. And do you have an understanding of whether, so I think the argument is that she didn't know he was law enforcement because it was an unmarked vehicle, but there's something about an antenna. Do you have a position on whether she knew or didn't know about whether he was law enforcement? Well, yeah, that it doesn't count in her favor, that it's ambiguous. It's without question that the car wasn't marked. It's also without question, though, that he had his uniform on. She filed a declaration below. The only fact that she, she only mentions the truck when she says it pulled me over. So, you know, this whole idea of whether she saw him or not, there was no evidence to that effect. What we do know is that he said he only went to pull up alongside her once, once he saw that the windows were tinted, he pulled back a quarter mile. But was there anybody else on the road? It's a pretty remote area, right? Yeah. What does the record say about whether there were any other cars on the road? Well, you know, I think it did say something. At one point, he found that the lane changes without the signal. It seemed suspicious because he... Something to the effect of no traffic. He said, yeah, there was... Exactly. Okay, thank you very much. Thank you. Have two minutes for rebuttal.  Hello again. So I just want to make sure that I answer any questions your honors have about the statements issue. It sounds like your honors understand the arguments well. One thing I just wanted to briefly point out is that in Smith, the invocation also happened during the reading of Miranda Rights, and there was a back and forth in Smith versus Illinois about whether that was material. The defense said yes. The majority said no. Ms. Madueno was perfectly within her rights to invoke during the reading of her Miranda Rights. And indeed, she indicated twice before she invoked that she already understood her rights, both when she nodded yes to the agent asking her directly, do you understand your rights? And when initialling. So no reasonable officer would have thought she was asking a question. Turning to reasonable suspicion, I just want to be clear about the checkpoint, because I think some questions were raised about that. It is our understanding, I would say, I think the government and I have a pretty different reading of the record on this point. It was my understanding, and I believe it was understood below that the I-8 checkpoint was generally non-operational at the time Ms. Madueno was going through it. So that means it was non-operational when Ms. Madueno went through it, but it was also non-operational for every other person who was using the I-8 at that time. So it really doesn't distinguish Ms. Madueno from any other law-abiding person on the road. And when this court has looked to the- Well, yeah, I mean, on that specific point, maybe.  But when you combine it with the fact that all of a sudden her traffic across the border is very high volume at a period in which the checkpoint is generally non-operational, one can infer from that something. Your Honor, actually, if you look at the very ER site that the government was pointing to, it shows that the vast majority of her crossings, she was not going through the I-8 checkpoint. So on that sheet, there are about 10 trips memorialized, and only in two of them did she pass through the I-8 checkpoint. By the way, we agree Agent Contreras did have information about the I-8 checkpoint. He did not have information about the interior Highway 86 checkpoint, which was a big part of Agent Smith's analysis. But when it comes to this page ER-164, you can see when it'll say I-8. And only twice in those 10 trips did she go through the I-8 checkpoint. Those were not during her quick trips that Agent Smith flagged. They were during lengthy 12, 13-hour trips into the country. Is the number of trips suspicious, though? Agent Contreras found the trips suspicious for... Agent Smith found the trips suspicious for two reasons. One, he looked way back past six months to all of her crossing history and found that her volume had increased over time. There is no evidence that Agent Contreras went back that far. This ER-164 that the government gave us to illustrate what he was looking at only goes back through October. Second, Agent Smith took a look at the Sentry application, and he saw on the Sentry application, it looks like Ms. Madueno's working at T-Mobile. It is inconsistent with work at T-Mobile to be coming in for just an hour or two at a time. So in both of those situations, Agent Smith is drawing conclusions based on information that Agent Contreras just did not have. And so we should be unsurprised that Agent Contreras never expressed any suspicions about Ms. Madueno's crossing patterns, never talked about her short trips, never talked about it being suspicious that she went through the non-operational checkpoint, just really never expressed any of these suspicions at all because he was not looking at the same information. I think we've asked all our questions. Thank you both sides for the very helpful arguments. This case is submitted.
judges: Boggs, FRIEDLAND, BRESS